IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER GEORGACARAKOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-cv-01655 |
| | ) | |
| FEDERAL BUREAU OF | ) | |
| INVESTIGATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and currently located in Winchester, Virginia. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 281

employees who staff a total of ten (10) FBIHQ units and two (2) field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to FBI records and information pursuant to the FOIA, as amended by the OPEN

Government Act of 2007, and the Open FOIA Act of 2009; the Privacy Act of 1974 ("PA");

Executive Order 13526; Presidential, Attorney General and FBI policies and procedures; judicial

decisions; and Presidential and Congressional directives. The statements contained in this

declaration are based upon my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations reached and made in accordance

therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of the

FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of

the FBI's responses to the FOIA/Privacy Act ("FOIA/PA") request of Peter Georgacarakos, who

has sought access to FBI records pertaining to the investigation of the murder of Randall Scott

Anderson, for which Georgacarakos was convicted and sentenced to 360 months in prison.

(4)     In response to plaintiff's request, the FBI reviewed and processed a total of

approximately 256 pages. On January 14, 2011, the FBI released one page in full, and withheld

236 pages in part and 19 pages in full pursuant to FOIA Exemptions 3, 6, 7(C) and 7(D), 5 U.S.C.

§§ 552 (b)(3), (b)(6), (b)(7)(C), and (b)(7)(D). The FBI subsequently reprocessed the 19 pages

withheld in full and re-released those withheld in part pages on November 14, 2011. The FBI

submits this declaration in support of its motion for summary judgment and to provide the Court

and plaintiff with an explanation of the procedures used to search for records responsive to

plaintiff's request, and justifications for the withholding of information from these releases in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

## CORRESPONDENCE AND LITIGATION HISTORY

(5)     By letter dated March 18, 2010 to FBIHQ, plaintiff requested "copies of all 302s related to the investigation in the death of Randall Anderson, for which I was prosecuted."[1] Plaintiff did not include a third-party privacy waiver, proof of death, or a showing of sufficient public interest.  (**See** **Exhibit A**.)

(6)     By letter dated April 6, 2010, the FBI notified plaintiff that it had assigned FOIPA No. 1145866-000 to his request, and that it was searching the indices to its Central Records System ("CRS") for responsive records.  (**See** **Exhibit B**.)

(7)     By letter dated July 22, 2010, the FBI notified plaintiff that it was searching for and evaluating potentially responsive files, and that plaintiff could contact the FBI's FOIPA Public Information Center for the status of his request.  (**See** **Exhibit C.**)

(8)     By letter dated October 19, 2010, the FBI again notified plaintiff that it was continuing to search for and evaluate potentially responsive files.  (**See** **Exhibit D.**)

(9)     By letter dated January 14, 2011, the FBI released to plaintiff in full or in part 237 pages out of 256 pages reviewed.  The FBI withheld 19 pages in full.  The FBI asserted FOIA Exemptions (b)(3), (b)(6), (b)(7)(C) and (b)(7)(D), as well as Privacy Act Exemption (j)(2).  The FBI notified plaintiff of his right to file an appeal of any denials with the U.S. Department of Justice Office of Information Policy ("OIP").  (**See** **Exhibit E.**)

---

[1]   An FD-302 is an internal FBI form on which the results of FBI interviews of individuals are recorded.  Such interview information may later be used as evidence in Federal Grand Jury proceedings or at criminal trials.  Additionally, these interview forms are often incorporated into FBI Investigative Reports.

(10)    By letter to OIP dated February 9, 2011, plaintiff appealed withholdings in the January 14, 2011 release. **(See Exhibit F.)**

(11)    By letter dated March 2, 2011, OIP acknowledged plaintiff's appeal and notified him that it had been assigned number AP-2011-01230. **(See Exhibit G.)**

(12)    By letter dated July 29, 2011, OIP notified plaintiff that it had remanded his FOIA/PA request to the FBI for reprocessing of the 19 pages withheld in full, but otherwise affirmed the FBI's processing of documents. **(See Exhibit H.)**

(13)    Plaintiff filed the complaint in this case on or about September 14, 2011.

(14)    By letter dated November 14, 2011, the FBI released to plaintiff the 19 reprocessed pages remanded by OIP. The FBI asserted FOIA Exemptions (b)(6), (b)(7)(C) and (b)(7)(D) with respect to these reprocessed pages. The FBI notified plaintiff of his right to file an appeal of any denials with OIP. As of January 19, 2012, the OIP has no record of an appeal by plaintiff. **(See Exhibit I.)**

## CRIMINAL HISTORY OF PETER GEORGACARAKOS

(15)    In the mid-1990s, while serving a 260-month sentence in the Lewisburg, Pennsylvania federal prison on a 1992 federal drug conviction, plaintiff formed the White Order of the Thule, a white-supremacist organization. On November 7, 1996 plaintiff and another inmate brutally stabbed to death a third inmate, Randall Scott Anderson. Anderson, who was white, had been serving a sentence for the racially-motivated bombing of a roller-skating rink and for defacing a synagogue. Anderson apologized to the Court and while in prison, and a few days before his murder, converted to Islam. Three days later, a second Lewisburg inmate, Perry York, was murdered – allegedly in retaliation for the Anderson murder. The FBI had primary

responsibility for the murder investigations, and the Philadelphia Field Office opened the

Anderson investigation case under file number 90A-PH-80620. In 2004, plaintiff was convicted of

second degree murder of Anderson in the U.S. District Court for the Middle District of

Pennsylvania, and will begin serving a 360-month sentence after completion of the drug sentence.

Plaintiff now resides in a maximum security federal prison in Florence, Colorado.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(16)    The CRS, which is utilized to conduct searches in response to FOIA and Privacy

Act requests, enables the FBI to maintain all information which it has acquired in the course of

fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS

consist of administrative, applicant, criminal, personnel, and other files compiled for law

enforcement purposes. This system consists of a numerical sequence of files broken down

according to subject matter. The subject matter of a file may relate to an individual, organization,

company, publication, activity, or foreign intelligence matter (or program). Certain records in the

CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are

maintained in those field offices. Although the CRS is primarily designed to serve as an

investigative tool, the FBI utilizes the CRS to conduct searches that are likely to yield documents

responsive to FOIA and Privacy Act requests. The mechanism the FBI uses to search the CRS is

the Automated Case Support System ("ACS").

(17)    Access to the CRS is obtained through the General Indices, which are arranged in

alphabetical order. The General Indices consist of index cards on various subject matters that are

searched either manually or through the automated indices. The entries in the General Indices fall

into two categories:

(a)     A "main" entry – A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.

(b)     A "reference" entry – A "reference" entry, sometimes called a "cross-reference," is generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(18)     Access to the CRS files in FBI field offices is also obtained through the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a particular subject, such as Peter Georgacarakos, are made by searching the subject requested in the index. FBI field offices have automated indexing functions.

(19)     On or about October 16, 1995, the ACS system was implemented for all field offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that were previously automated. Because the CRS cannot electronically query the case files for data, such as an individual's name or social security number, the required information is duplicated and moved to the ACS so that it can be searched. ACS can be described as an internal computerized subsystem of the CRS. Over 105 million records from the CRS were converted from automated systems previously utilized by the FBI. Automation did not change the CRS; instead, automation has facilitated more economic and expeditious access to records maintained in the CRS.

(20)     ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a)     Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office or Origin ("OO"), which sets leads

for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs") – formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ that are conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation; "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b)    Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All <u>original</u> serials are maintained in the OO case file.

(c)    Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 111.7 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(21)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of

federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which

the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a

particular subject matter or individual, i.e., Peter N. Georgacarakos.

## SEARCH FOR RESPONSIVE FILES

(22)    The FBI conducted a search of the CRS for records responsive to plaintiff's request

by running searches using ACS.  The ACS queries utilized by RIDS consisted of a six-way

phonetic breakdown of plaintiff's name, including any variations of the first or last name that

sound like or are spelled differently than the name.  In this case, the breakdown would have

included the following variations: "Peter N. Georgacarakos," "Peter Georgacarakos," or "P.

Georgacarakos."  As a result of this search, the FBI identified one responsive main file, 90A-PH-

80620, which pertains to the investigation of the Anderson murder.  Plaintiff's request sought

access to "all 302s" relating to the murder investigation; consequently, RIDS identified and

processed all 302s in the case file.

## JUSTIFICATION FOR NON-DISCLOSURE
## UNDER THE PRIVACY ACT (j)(2)

(23)    Section (j)(2) of the Privacy Act exempts from mandatory disclosure systems

of records "maintained by an agency or component thereof which performs as its principal

function any activity pertaining to the enforcement of criminal laws, including police efforts to

prevent, control, or reduce crime or to apprehend criminals . . . ."

(24)    All of the records generated by the FBI as a result of its investigation into

plaintiff's activities are part of the FBI's CRS, which is a system of records specifically exempt

from  the Privacy Act, 5 U.S.C.§ 552a.  These records were compiled as a result of the FBI's

legitimate law enforcement mission to investigate possible violations of criminal laws.

-8-

Specifically, the FBI investigated plaintiff for a murder which occurred in a federal prison in violation of 18 U.S.C. §§ 1111 and 1112. Accordingly, these files are exempt from disclosure under the Privacy Act, 5 U.S.C. § 552a(j), in conjunction with 28 C.F.R. § 16.96. Although the FBI denied access to these records under the Privacy Act, it processed these records under the access provisions of the FOIA to achieve maximum disclosure.

## EXPLANATION OF CODED FORMAT USED
## FOR THE JUSTIFICATION OF DELETED MATERIAL

(25)    RIDS processed all responsive documents in order to achieve maximum disclosure consistent with the access provisions of the FOIA. RIDS has made every effort to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material. The FBI has not withheld any reasonably segregable, non-exempt portions from plaintiff.

(26)    The FBI has processed a total of 257 pages.[2] Copies of these pages are attached hereto as **Exhibit J**. Out of these 257 pages, RIDS released one page in full and 256 pages in part. Each page of the processed documents contained in **Exhibit J** is Bates-numbered sequentially – "Georgacarakos-1" through "Georgacarakos-257." The documents in **Exhibit J** contain, on their faces, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA. The coded categories are provided to aid the Court's and plaintiff's review of the FBI's explanations of the FOIA exemptions it has asserted to withhold the material.

---

[2] The number of processed pages increased from 256 to 257 during the FBI's review for the purpose of Vaughn code application, because the FBI determined that one page, previously excluded, should be processed. Identifiable as Georgacarakos-226, this second page of an FD-302 merely repeats the name of the person interviewed, the FBI File Number, and the date of the interview, and contains no substantive information. That page, with appropriate redactions, is released to plaintiff at Exhibit J.

(27)    Most withholdings of information are accompanied by a code that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on the page, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning "Unwarranted Invasion of Personal Privacy."  The subcategory "1" narrows the main category to the more specific subcategory "Names and/or Identifying Information of FBI Special Agents and Support Personnel."  The coded categories of exemptions used in the processing of documents responsive to plaintiff's requests are as follows:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(3)** | **INFORMATION PROTECTED BY STATUTE** |
| **(b)(3)-1** | Grand Jury Information - Fed. R. Crim. Pro. 6(e) |
| **Categories (b)(6) and (b)(7)(C)** | **CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| **(b)(6)-1 and (b)(7)(C)-1** | Names and/or Identifying Information of Third Parties Who Provided Information to the FBI |
| **(b)(6)-2 and (b)(7)(C)-2** | Names and/or Identifying Information Concerning Non-FBI Federal Government Personnel |
| **(b)(6)-3 and (b)(7)(C)-3** | Names and/or Identifying Information of Third Parties of Investigative Interest |
| **(b)(6)-4 and (b)(7)(C)-4** | Names and/or Identifying Information of FBI Special Agents |
| **(b)(6)-5 and (b)(7)(C)-5** | Names and/or Identifying Information Concerning Third Parties Merely Mentioned |
| **Category (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| **(b)(7)(D)-1** | Name and/or Identifying Information of an Individual Who Provided Information Under an "Implied" Assurance of Confidentiality |
| **(b)(7)(D)-2** | Name and/or Identifying Information of an Individual Who Provided Information Under an "Express" Assurance of Confidentiality |

## EXEMPTION (b)(3)
## INFORMATION PROTECTED BY STATUTE

(28)    5 U.S.C. § 552 (b)(3) exempts from disclosure information which is:

> specifically exempted from disclosure by statute . . . if that statute
> (A)(i) requires that the matters be withheld from the public in such a manner
> as to leave no discretion on the issue; or (A)(ii) establishes particular criteria
> from withholding or refers to particular types of matters to be withheld; and (B) if
> enacted after the date of enactment of the Open FOIA Act of 2009, specifically
> cites to this paragraph.

### (b)(3)-1      Federal Grand Jury Information (Rule 6(e) of the Federal Rules of Criminal Procedure)

(29)    The FBI has asserted Exemption (b)(3)-1 in conjunction with Rule 6(e) of the

Federal Rules of Criminal Procedure to withhold Federal Grand Jury information.  As relevant to 5

U.S.C. § 552 (b)(3)(B), Rule 6(e) is a statute[3] enacted before the date of enactment of the Open

FOIA Act of 2009.[4]  It is well-established that Rule (6)(e) embodies a broad, sweeping policy of

preserving the secrecy of grand jury material regardless of the substance in which the material is

contained.  In the investigative file documents responsive to plaintiff's request, only that

information which explicitly discloses matters occurring before a Federal Grand Jury has been

withheld pursuant to Exemption (b)(3)-1.  Specifically, details concerning a Federal Grand Jury

subpoena, including the name and identifying information of an individual subject to a Federal

Grand Jury subpoena and information that identifies specific records or evidence subpoenaed by

---

[3] As prescribed by 18 U.S.C. § 3771, proposed rules become effective ninety days after
the Chief Justice reports them to Congress. By order of April 26, 1976, the Supreme Court
adopted amendments to the Federal Rules of Criminal Procedure which included Rule 6(e) and
reported the amendments to Congress. Congress voted to delay the effective date of several of the
proposed rules, to include Rule 6(e), "until August 1, 1977, or until and to the extent approved by
Act of Congress, whichever is earlier." Pub.L. No. 94-349 § 1, 90 Stat. 822 (1976).
Subsequently, Congress, by statute, enacted a modified version of Rule 6(e); Pub.L. No. 95-78, §
2(a), 91 Stat. 319 (1977), Fed. R. Crim. P. 6(e).

[4] The Open FOIA Act of 2009 was enacted October 28, 2009, Pub.L. 111-83, 123 Stat.
2142, 2184; 5 U.S.C. § 552(b)(3)(B).

the Federal Grand Jury were withheld pursuant to this exemption. The disclosure of this material would clearly reveal a subject of investigation as well as a specific aspect of the Grand Jury's investigation into a prison murder, thereby revealing the secret, inner workings of the Federal Grand Jury that considered the case. Accordingly, the FBI has properly asserted FOIA Exemption (b)(3)-1 to withhold this information.[5]

## EXEMPTION (b)(7) THRESHOLD

(30)    Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the six sets of harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552 (b)(7). In this case, the harm that could reasonably be expected to result from disclosure concerns the invasion of personal privacy, and the revelation of the identity of confidential sources under both an express and implied confidentiality.

(31)    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency. As previously explained, the FBI investigated plaintiff for a murder which occurred in a federal prison in violation of 18 U.S.C. § 1111 and 1112. See supra ¶¶15, 22. Accordingly, the responsive records--form FD 302s--contained in investigative main file 90A-PH-80620 were generated pursuant to the law enforcement duties of the FBI. Therefore, the information was compiled for a law enforcement purpose and readily meets the threshold requirement of Exemption (b)(7). The remaining inquiries are whether its

---

[5] Exemption (b)(3)-1 has been asserted on the following page: Georgacarakos-224.

disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy,

or could reveal confidential source information under either an express or implied assurance of

confidentiality.

## EXEMPTIONS (b)(6) AND (b)(7)(C)
## CLEARLY UNWARRANTED AND UNWARRANTED
## INVASION OF PERSONAL PRIVACY[6]

(32)     5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and

similar files when the disclosure of such information would constitute a clearly unwarranted

invasion of personal privacy."  5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to
> constitute an unwarranted invasion of personal privacy.

(33)     When withholding information pursuant to these exemptions, the FBI is required to

balance the privacy interests of the individuals mentioned in these records against any public

interest in disclosure.  In asserting these exemptions, each item of information was examined to

determine the degree and nature of the privacy interest of every individual whose name and/or

identifying information appears in these records.  The public interest in disclosure of this

information is determined by whether the information in question would inform plaintiff and the

general public about the FBI's performance of its mission to enforce federal criminal statutes and

protect the national security of the United States and/or how the information would shed light on

---

[6] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C).  Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

the FBI's performance of its mandated statutory duties. In each instance where the FBI withheld information, it determined that individual privacy rights outweighed the public interest. The only recognized public interest is that which sheds light on the operations and activities of the federal government. In this case, revelation of the names and/or identifying information of individuals in the context of the records of an FBI criminal investigation could reasonably be expected to cause harassment, embarrassment and/or humiliation, and thus constitute a clearly unwarranted invasion of personal privacy. Therefore, the FBI concluded that the information should be withheld under Exemptions (b)(6) and (b)(7)(C), and determined that the individuals' privacy interests were not outweighed by any public interest in disclosure. Every effort has been made to release all segregable information contained in these records without invading the privacy interests of these individuals.

### (b)(6)-1 and (b)(7)(C)-1   Name and/or Identifying Information Concerning Third Parties Who Provided Information to the FBI

(34)   Exemption (b)(6)-1 and (b)(7)(C)-1 have been asserted to protect the names and identifying information of individuals who were interviewed by the FBI during the course of the Randall Anderson murder investigation. The FBI interviewed dozens of individuals, the majority of whom were inmates.

(35)   The FBI has found that information provided by individuals during interviews is one of the most productive investigative tools used by law enforcement agencies. The largest roadblock to successfully obtaining the desired information through an interview is fear by the interviewee that their identity will possibly be exposed and consequently they could be harassed, intimidated, or threatened with legal action, economic reprisal, possible physical harm, or even death. This fear is particularly valid in the prison context, and in this investigation, where two

inmates murdered another inmate.  In order to surmount these obstacles, persons interviewed by the FBI must be assured that their names and personally-identifiable information will be maintained in the strictest confidence.  The continued access by the FBI to persons willing to honestly relate pertinent facts bearing upon a particular investigation far outweighs any benefit plaintiff might derive from being furnished the names of those who cooperated with the FBI.

(36)    The FBI has determined that the third parties who provided information to the FBI maintain a substantial privacy interest in not having their identities disclosed.  After identifying the substantial privacy interests of the third parties, the FBI next balanced their right to privacy against the public interest in the disclosure of the information.  The FBI could identify no discernible public interest in the disclosure of this information, as disclosure of the third parties' names and identifying information would not shed light on the operations and activities of the FBI. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy.  The FBI properly withheld this information pursuant to Exemptions (b)(6)-1 and (b)(7)(C)-1.[7]

### (b)(6)-2 and (b)(7)(C)-2     Names and/or Identifying Information of Non-FBI Federal Government Personnel

(37)    Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted to protect the names of Federal Bureau of Prisons special investigative agents, guards, a probation officer, an Assistant U. S. Attorney, and a federal public defender.  The relevant inquiry here is whether public access to this information would violate a viable privacy interest of these individuals and whether there is a public interest in releasing their identities.  Disclosure of their identities and identifying

---

[7] Exemptions (b)(6)-1 and (b)(7)(C)-1 have been asserted on the following pages: Georgacarakos-1-10, 13-192 and 196-257.

information could subject these federal law enforcement employees to unauthorized inquiries and harassment which would constitute a clearly unwarranted invasion of their personal privacy. The rationale for protecting non-FBI federal employees is the same as that for FBI employees, infra.

(38)    In balancing the legitimate privacy interests of these individuals against any public interest in disclosure, the FBI determined that there is a complete lack of bona fide public interest in this information because its disclosure will not shed light on the operations and activities of the federal government. Accordingly, the FBI has concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. The FBI properly withheld this information pursuant to Exemption (b)(6)-2 and (b)(7)(C)-2.[8]

### (b)(6)-3 and (b)(7)(C)-3    Names and/or Identifying Information of Third Parties of Investigative Interest

(39)    The FBI has asserted Exemptions (b)(6)-3 and (b)(7)(C)-3 to protect the names and identifying information of third parties who were of investigative interest to the FBI. Identifying information withheld concerning these third parties includes names, social security numbers, criminal histories and other personally-identifiable information. Being linked with any law enforcement investigation carries a strong negative connotation and a stigma. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Accordingly, the FBI has determined that these individuals

---

[8] Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted on the following pages: Georgacarakos-1, 3, 5, 8, 10-11, 13, 15, 17-38, 40, 42-43, 45, 47-48, 50, 52, 54, 56, 58,60,62-63, 65-68, 70-72, 74-75, 77, 79-80, 82-83, 85, 87, 89, 91–92, 94, 96-97, 99, 101, 103, 105, 107, 110-111, 113, 115, 121, 124-125, 127-128, 130, 132, 134, 136, 138, 140-142, 144-146, 148, 150,152-153, 155-157, 165, 168, 172, 174, 176, 178-180, 182, 184, 186, 188, 190-191, 193, 196, 198-199, 201, 203-204, 211-212, 215, 217, 221, 224-225, 227-228, 233, 239-240, 244, 247-249, 252 and 254.

maintain a substantial privacy interest in not having their identities disclosed.

(40)     In making a determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individuals' right to privacy.  The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of the third parties' names and identifying information would not shed light on the operations and activities of the FBI.  Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and an unwarranted invasion of their personal privacy.  The FBI properly withheld this information pursuant to Exemptions (b)(6)-3 and (b)(7)(C)-3.[9]

### (b)(6)-4 and (b)(7)(C)-4          Names and/or Identifying Information of FBI Special Agents

(41)     Exemptions (b)(6)-4 and (b)(7)(C)-4 have been asserted to protect the names and identifying information of FBI Special Agents ("SAs") who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in the documents.  These responsibilities included conducting interviews and compiling the resulting information, as well as reporting on the status of investigations.  Assignments of SAs to any particular investigation are not by choice.  Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.  The privacy consideration is also to protect FBI SAs, as individuals, from

---

[9] Exemptions (b)(6)-3 and (b)(7)(C)-3 have been cited on the following pages: Georgacarakos-1-3, 11, 13-15, 33, 52, 56, 67, 75, 89, 103, 107, 112-113, 115, 117-119, 122, 124-125, 130, 136, 138, 142, 146, 148, 153, 159, 162, 164-165, 167-169, 171-172, 178-180, 182, 184, 186, 188, 190-191, 193-196, 211-214, 218-219, 221-225, 227-228, 230-232, 234-235, 237-244, 246 and 248-253.

unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years. These individuals may seek revenge on the agents and other federal employees involved in a particular investigation. The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent. As a result, FBI SAs have a strong privacy interest in having this information protected from disclosure. In balancing the privacy interests of FBI SAs against any public interest in disclosure, the FBI could identify no discernible public interest in the disclosure of this information because the disclosure of the names and identifying information of FBI SAs would not shed light on the operations and activities of the FBI. Thus, disclosure of this information would constitute a clearly unwarranted and an unwarranted invasion of their personal privacy. The FBI has properly protected this information pursuant to FOIA Exemptions (b)(6)-4 and (b)(7)(C)-4.[10]

### (b)(6)-5 and (b)(7)(C)-5     Names and/or Identifying Information Concerning Third Parties Merely Mentioned

(42)     Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted to withhold the names

---

[10] Exemptions (b)(6)-4 and (b)(7)(C)-4 have been asserted on the following pages: Georgacarakos-1, 3, 5, 8, 10-11, 13, 15, 17-40, 42-43, 45, 47-48, 50, 52, 54, 56, 58, 60, 62-63, 65-68, 70-72, 75, 77, 79-80, 82-83, 85, 87, 89, 91–92, 94, 96-97, 99, 101, 103, 105, 107, 109-113, 115, 117-119, 121-122, 124-125, 127-128, 130, 132, 134, 136, 138, 140-142, 144-146, 148, 150, 152-153, 155-157, 159, 161-162, 164-165, 167-169, 171-172, 174, 176, 178, 180, 182, 184, 186, 188, 190-191, 193, 196, 198-199, 201, 203-204, 211-212, 215, 217, 221-222, 224-225, 226-227, 230-235, 237-240, 242-245, 247-249, 254-255 and 257.

and identifying information of third parties merely mentioned in the FD-302s created in connection with the FBI's murder investigation. Besides names, identifying information includes prison cell locations, prison affiliations, and countries of origin. The FBI obtained information concerning third parties who came into contact with persons being interviewed during the Anderson murder investigation. These individuals were not of investigative interest to the FBI. These third parties maintain legitimate privacy interests in not having this information disclosed. If the FBI disclosed their names and other personal information, the disclosure would reveal that these third parties were connected with the FBI's investigation in some way. Disclosure of the third parties' names and identifying information in connection with the FBI's investigation of criminal activities carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Accordingly, the FBI determined that the third parties maintain a substantial privacy interest in not having information about them disclosed.

(43)    After identifying the substantial privacy interests these individual maintain, the FBI balanced their right to privacy against the public interest in the disclosure. The FBI determined that there is no public interest in the information, because disclosure of the name of a third party merely mentioned would not shed light on the operations and activities of the FBI, and disclosure would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Accordingly, the FBI properly protected this information pursuant to FOIA Exemptions (b)(6)-5 and (b)(7)(C)-5.[11]

---

[11] Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted on the following pages: Georgacarakos-2, 5-6,11, 20, 23-24, 30, 32, 34, 37, 45, 48, 50, 56, 62, 66-67, 70, 79, 82-83, 87, 89-91, 94, 97, 101, 103, 107, 109, 112, 113, 115, 118-119, 121-122, 125, 128, 130, 132, 134, 136, 138, 140-142,144-146, 148, 150, 152-153, 155, 157, 159, 161, 165, 167, 169, 172, 174, 176, 178-179, 182, 184, 186, 188, 191, 193-196, 198-199, 201, 203-209, 212-213, 217, 219, 231-232,

## EXEMPTION (b)(7)(D)
## CONFIDENTIAL SOURCE INFORMATION

(44)    5 U.S.C. § 552 (b)(7)(D) protects from disclosure

>  records or information compiled for law enforcement purposes [which]
>  could reasonably be expected to disclose the identity of a confidential
>  source, including a state, local or foreign agency or authority or any private
>  institution which furnished information on a confidential basis, and, in the
>  case of a record or information compiled by a criminal law enforcement
>  authority in the course of a criminal investigation or by an agency
>  conducting a lawful national security intelligence investigation, information
>  furnished by a confidential source.

(45)    Numerous confidential sources report to the FBI on a regular basis and are

"informants" within the common meaning of the term. Some of these sources provide information

under an express assurance of confidentiality. Other individuals are interviewed under

circumstances from which an assurance of confidentiality can reasonably be inferred. These

individuals are considered to be confidential sources since they furnished information only with

the understanding that their identities and the information provided will not be released outside the

FBI. Information provided by these individuals is singular in nature, and if released, could reveal

their identity.

(46)    The FBI has learned through experience that individuals who assist, cooperate with

and provide information to the FBI must be free to do so without fear of reprisal. The FBI has also

learned that individuals who provide information to the FBI must be free to furnish that

information with complete candor and without the understandable tendency to hedge or withhold

information because of fear that their names or their cooperation with the FBI will later be made

_____

237, 241, 244, 248-251, 253 and 257.

public. Individuals who provide information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence. The release of a source's identity would forever eliminate that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources not just in that case but in future cases as well.

### (b)(7)(D)-1    Names and/or Identifying Information of Individuals Who Provided Information Under an "Implied" Assurance of Confidentiality

(47)    Exemption (b)(7)(D)-1 has been asserted, at times in conjunction with Exemptions (b)(6)-1 and (b)(7)(C)-1, to protect the identities of, and information received from, individuals who provided information to the FBI during the course of the Randall Anderson murder investigation. These individuals were interviewed under circumstances from which an assurance of confidentiality may be implied, since the individuals were questioned about the murder itself, the events leading up to the murder and the events following the murder. As this investigation concerned an extremely violent stabbing of a prison inmate by other inmates, and was likely motivated by prison affiliations, it can be implied these individuals providing information would reasonably fear that disclosure of their identities would place them in danger. If the interviewees' identities were released, it would likely subject them to harassment or reprisal. Interviews conducted under such assurances of confidentiality warrant the protection of the interviewee's name as well as the information the interviewee provided, but only to the extent that the information would identify the interviewee. In the processing of the records concerning plaintiff, RIDS's objective was to release as much segregable information as possible without

revealing the identities of the individuals interviewed. The preservation of this information is

essential to effective law enforcement and to encouraging cooperation of witnesses in future

investigations. Disclosure could have a disastrous impact upon the ability to obtain this kind of

information in the future, and would have a chilling effect upon the free-flow of information

essential to pursue and resolve criminal investigations. The FBI has found that it is only with the

understanding of complete confidentiality that the aid of such sources can be enlisted, and only

through this confidence that these sources can be persuaded to continue to provide valuable

assistance in the future. The FBI has properly withheld this information pursuant to FOIA

Exemption (b)(7)(D)-1.[12]

### (b)(7)(D)-2    Name and/or Identifying Information of an Individual Who Provided Information Under an "Express" Assurance of Confidentiality

(48)    Exemption (b)(7)(D)-2 has been asserted in conjunction with Exemptions (b)(6)-1

and (b)(7)(C)-1, to protect the name, identifying data and information of a third party who was

interviewed during the course of this FBI investigation under an express grant of confidentiality.

Prior to conducting the interviews, the FBI expressly promised the third party interviewee that

their identity and the information they provided would not be disclosed. This is evidenced by the

---

[12] Exemption (b)(7)(D)-1 has been asserted on the following pages: Georgacarakos-1-3, 5-6, 8, 10, 13, 15-38, 40, 42-43, 45, 47-48, 50, 52, 54, 56, 58, 60, 62-63, 66-68, 70-72, 74-77, 79-80, 82-83, 85, 87, 89-92, 94, 96-97, 99, 101, 103, 105, 107, 109-113, 115, 117-119, 121-122, 124-125, 127-128, 130, 132, 134, 136, 138, 140-142, 144-146, 148-150, 152-153, 155-157, 159, 161-162, 164-165, 167-169, 171-172, 174, 176-182, 184, 186, 188, 190-191, 196, 198-199, 201, 203-215, 217-221, 224-225, 228-237 and 239-257.

fact that the Special Agent who conducted the interview documented the request with insertion of the term "Protect Identity" in the body of the FD-302.

(49)    The individual mentioned in this FD-302 would reasonably fear that disclosure of their identity would place them in danger, particularly in light of the brutal attack and murder of a fellow inmate. In addition, disclosure of the identity of – and information provided by – a confidential source who has expressly been promised confidentiality has wider implications. If the FBI were to disclose the identities of – and information provided by – confidential sources, such disclosure would have a chilling effect on the activities and cooperation of other FBI confidential sources in the future. The FBI has found that it is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue to provide valuable assistance in the future. Thus, the identities of, and the information provided by, the source who was expressly promised confidentiality were properly withheld pursuant to FOIA Exemption (b)(7)(D)-2.[13]

## CONCLUSION

(50)    The FBI has processed and released all reasonably segregable information from the records responsive to plaintiff's request to the FBI. All documents were processed to achieve maximum disclosure consistent with the access provisions of the Privacy Act and the FOIA. As noted above, 19 pages were reprocessed and released to ensure reasonably segregable material

---

[13]   Exemption (b)(7)(D)-2 has been asserted on the following page: Georgacarakos-238.

was identified and released. As a result, no reasonably segregable, nonexempt portions were withheld from plaintiff. The remaining information has been withheld pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D); U.S.C. §§ 552 (b)(3), (b)(6), (b)(7)(C) and (b)(7)(D). The FBI has carefully examined the responsive documents and has determined that the information withheld from plaintiff, if disclosed, could reveal information protected by statute; could cause unwarranted and clearly unwarranted invasion of the personal privacy interests of third parties; and could disclose the identities of – and information provided by – confidential sources. Accordingly, all reasonably segregable, non-exempt information has been released to plaintiff in response to his FOIA/PA request to the FBI.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through J attached hereto are true and correct copies.

Executed this 19th day of January, 2012.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia